NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SCHINDLER ELEVATOR CORP., | : | |
| Plaintiff, | : | |
| v. | : | |
| OTIS ELEVATOR CO., | : | |
| Defendant. | : | **Hon. Dennis M. Cavanaugh** |
| | : | **OPINION** |
| OTIS ELEVATOR CO. | : | Civil Action No. 09-cv-0560 (DMC) |
| Counterclaim Plaintiff, | : | |
| v. | : | |
| SCHINDLER ELEVATOR CORP. and SCHINDLER AUFZÜGE AG, | : | |
| Counterclaim Defendants. | : | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motions by Schindler Aufüge ("Aufüge" or "Counterclaim Defendant"). In this matter, Otis Elevator Company ("Otis" or "Counterclaim Plaintiff") asserts a counterclaim for indirect infringement of United States Patent No. 6,739,433 (the "'433 Patent") against Aufüge. Aufüge, pursuant to FED. R. CIV. P. 12(b)(2) and/or 12(b)(6), moves to dismiss Otis' counterclaim. No oral argument was heard pursuant to FED. R. CIV. P. 78.

For the reasons stated below, Aufüge's motions are **denied.**

I. **BACKGROUND**[1]

A. PROCEDURAL HISTORY

On December 23, 2008, Schindler Elevator Corporation ("Schindler N.J.") filed the present action seeking a declaration that the '433 Patent is invalid. The '433 Patent covers flat belts for use in lifting elevator cars. The patent teaches the use of flat belts instead of round ropes for tension members, as using ropes has a number of drawbacks.

Otis filed its answer and a counterclaim on January 22, 2009, alleging that Schindler N.J. infringed the '433 Patent. Otis amended its complaint to assert infringement against Schindler Aufzüge AG ("Aufzüge"). In its counterclaim, Otis alleges that Schindler N.J. and Aufzüge directly and indirectly infringed the '433 Patent. On June 26, 2009, Aufzüge moved to dismiss Otis' claims pursuant to FED. R. CIV. P. 12(b)(2) and/or 12(b)(6).

B. FACTS

Aufzüge is an entity formed under the laws of Switzerland, having a principal place of business in Ebikon, Switzerland. See Aufzüge's Brief in Support of its Motion to Dismiss ("Aufzüge Br."), at 2. Aufzüge is a wholly-owned subsidiary of Schindler Holding AG. Id. Schindler N.J. is a Delaware corporation with its principal place of business in Morristown, New Jersey. Id. Schindler N.J. is a subsidiary of Schindler Enterprises Inc., a Delaware corporation, which is a wholly-owned subsidiary of Schindler Holding AG. Id. The companies, then, are indirectly affiliated in that they both are subsidiaries of Schindler Holding AG. Id. at 1-2.

Although the companies are affiliated, Aufzüge and Schindler N.J. are separate entities that maintain independent financial records. Id. Neither company owes or controls the stock of the other.

---

[1] The facts in the Background section are taken from the parties' moving papers.

Id. at 3. Aufzüge does not realize any profits or losses based on Schindler N.J.'s revenues or expenditures. Id. Aufzüge is not involved in creating or approving Schindler N.J.'s budgets, and has no control over Schindler N.J.'s resources. Id.

Schindler N.J. maintains its own research and development ("R&D") department. Id. Aufzüge is, however, involved in selecting Schindler N.J.'s director of R&D—this fact notwithstanding, Aufzüge asserts that it is not involved in the approval of Schindler N.J. projects.

Aufzüge is a Swiss company doing business in Switzerland. Id. Aufzüge does not maintain any offices or facilities in the State of New Jersey. Id. Aufzüge is not licensed to do business in New Jersey, and has not designated an agent for service of process. Id. Aufzüge does not own or have any rights to any real or personal property in New Jersey. Id. Aufzüge does not maintain a bank account or telephone listing in New Jersey. Id. Aufzüge does not advertise or solicit business in New Jersey. Id.

Aufzüge developed the Gates LL MV 90-07 Tension Member ("the Gates Tension Member") in Switzerland. Id. In 2003, Schindler N.J. began investigating alternate suspension systems for the North American market. Id. at 4. Schindler N.J. imported Gates Tension Members into the U.S. from Schindler, S.A., located in Zaragoza, Spain and Schindler Elettronica, S.A., located in Locarno, Switzerland. Id. Aufzüge has not provided Schindler N.J. with any Gates Tension Members or any other belt with similar steel configurations, and has not imported any Gates Tension Members, or any similar steel wire configurations, into the U.S. Id. Schindler N.J. has installed an elevator system designed for the European market having a prefabricated alternate suspension system at a Pennsylvania facility, and has installed Gates Tension Members at its New Jersey facility. Id. Aufzüge did not direct or manage either installation. Id. Aufzüge and Schindler N.J. share general

information through telephone calls and visits. Id. Aufzüge, however, asserts that personnel have not visited Schindler N.J. specifically in connection with the Gates Tension Member or any other belt with similar steel wire configurations. Id. Although Aufzüge is involved in selecting Schindler N.J.'s director of R&D, Aufzüge asserts that it is not involved in the approval of Schindler N.J. projects.

Otis' characterization of Aufzüge's role in Schindler N.J.'s activities is substantially different. Otis, relying on the testimony of Schindler N.J. personnel, asserts that Aufzüge's influence is more pervasive than as portrayed by Aufzüge. For example, Otis suggests that the two companies' personnel work together extensively, as evidenced by the inter-company workshops and meetings. See Otis' Brief in Opposition to Aufzüge's Motion to Dismiss ("Otis Br."), at 7-8. As described by a Schindler N.J. employee, "Schindler Aufzüge is an entity in Switzerland providing guidance, and there is a direct flow of information and a feedback process between [Schindler NJ] and Aufzüge." Id. at 17. Otis suggests that this "guidance" was such that Schindler N.J. required the "agreement" of various Aufzüge engineers before making product decisions, so as to "ensure that globally [Schindler is] working within certain boundaries, if you will, or certain norms, standards, that have to be met." Id. Moreover, it is not uncommon for Aufzüge employees to work at the Schindler N.J. facilities for extended periods of time. Id. at 13.[2] Contact between the two companies does not appear to be limited to isolated occurrences. A Schindler N.J. employee, for example, described the visitations by Aufzüge employees by stating that "[t]here are a number of people that are floating in and out." Id. at 7. In short, Otis' description of the Aufzüge/Schindler N.J. relationship suggests that Aufzüge plays a significant role in Schindler N.J. activities, particularly with respect to R&D.

---

[2] More detail regarding the exchange of employees between the two companies is provided below. See Section II.B.3, infra.

## II. SCHINDLER AUFZÜGE'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) FOR LACK OF PERSONAL JURISDICTION

Aufzüge moves to dismiss Otis' counterclaims, asserting that the Court lacks personal jurisdiction over Aufüge.

### A. APPLICABLE LAW

"Federal Circuit law governs personal jurisdiction issues where the jurisdictional issue is 'intimately involved with the substance of patent law." Avocent Huntsville Corp. v. Aten Int'l Co., 552 F.3d 1324, 1328 (Fed. Cir. 2008), cert. denied, 129 S.Ct. 2796 (2009).

A Plaintiff has the burden of demonstrating that assertion of jurisdiction over a defendant is proper. Elecs. for Imaging, Inc. v. Coyle, 340 F.3d 1344, 1351 (Fed. Cir. 2003) ("[W]here the district court's disposition as to the personal jurisdictional question is based on affidavits and other written materials in the absence of an evidentiary hearing, a plaintiff need only to make a prima facie showing that defendants are subject to personal jurisdiction."); Elcheikhali v. C.C.A., 2010 U.S. Dist. LEXIS 1054, at *6 (D.N.J. Jan. 6, 2010) ("Once a defendant has raised a jurisdictional defense, the plaintiff has the burden of demonstrating by a preponderance of the evidence that the defendant has purposefully directed its activities toward the residents of the forum state, or otherwise purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."). Once Otis has made a "threshold showing in support of jurisdiction," it is "entitled to have [its] allegations viewed as true and have disputed facts construed in [its] favor." Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 331 (3d Cir. 2009); Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004) (stating that when considering a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a court "must accept all of the plaintiff's

allegations as true and construe disputed facts in favor of the plaintiff.").

To determine whether personal jurisdiction exists over a foreign defendant, the Court of Appeals for the Federal Circuit has established a two-tier inquiry: (1) "whether a forum state's long-arm statute permits service of process"; and (2) "whether the assertion of personal jurisdiction would violate due process." Inamed Corp. V. Kuzmak, 249 F.3d 1356, 1359 (Fed. Cir. 2001); see also Colida v. LG Elecs., Inc., 2003 U.S. Dist. LEXIS 26818, at *6 (D.N.J. Apr. 28, 2003). As "New Jersey's long-arm statute 'permits the exercise of personal jurisdiction to the fullest limits of due process,'" the traditional two-part inquiry of the long-arm statute and due process "collapses into one —whether due process considerations permit the exercise of jurisdiction." Campbell Pet Co. v. Miale, 542 F.3d 879, 884 (Fed. Cir. 2008); IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998).

To demonstrate that considerations of due process permit the exercise of jurisdiction, a defendant must have certain "minimum contacts" with the forum, such that the assertion of personal jurisdiction over the defendant comports with "traditional notion of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). There are two ways that sufficient contacts for asserting personal jurisdiction can be established: "general jurisdiction" and "specific jurisdiction"; the focus, here, is on the latter.[3]

The Federal Circuit has established a three-factor test for specific jurisdiction, instructing courts to consider whether "(1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to the defendant's activities with the forum, and (3)

---

[3] Schindler asserts that neither can be established. Otis responds that the requirements for specific personal jurisdiction have be met. Otis Br., at 4.

assertion of personal jurisdiction is reasonable and fair." Synthes v. GMReis, 563 F.3d 1285, 1297 (Fed. Cir. 2009). Specific jurisdiction may be asserted, "even if the contacts are isolated and sporadic, so long as the cause of action arises out of or relates to those contacts." Id. (citing Silent Drive, Inc. v. Strong Indus., Inc., 326 F.3d 1194, 1200 (Fed. Cir. 2003). Indeed, a "substantial connection" with a forum arising out of a "single act can support jurisdiction." Burger King, 471 U.S. at 475 n.18 (citing McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)).

### B. ANALYSIS

The Court will consider each of the three factors of the Federal Circuit's specific jurisdiction test in turn.

#### 1. *Did Aufzüge purposefully direct its activities at residents of the forum?*

Aufzüge argues that personal jurisdiction cannot be established because it has not purposefully directed it activities at residents of New Jersey. Aufzüge asserts that it has not promoted or marketed any product or services to residents of New Jersey; nor did it sell, or contract to sell, the product in question (i.e., the Gated Tension Member or any similar product) in New Jersey. It has no distributor in New Jersey, and derives no revenue from sales in New Jersey. Aufzüge asserts that the only connection it has with New Jersey is that it selected Schindler N.J.'s director of research and development.

Otis responds that Aufzüge did direct its activities at the forum state. Specifically, it asserts that Aufzüge: (1) had its employees visit Schindler N.J. facilities in New Jersey, (2) provided product specifications for the infringing product to its New Jersey affiliate, (3) provided assistance, guidance and personnel to its New Jersey affiliate for product development, including the development of elevator belts. This Court agrees with Otis.

First, with respect to Aufzüge employees visiting Schindler N.J. facilities, the Court finds such contacts a significant indication that Aufzüge directs its activities at the forum state. Previously, the Federal Circuit has held that a Defendant purposefully directed its activities at a forum state where it made telephone calls to the forum state, and hired local counsel and sent two representative to the forum state. Elecs. for Imaging, 340 F.3d at 1351; see Grand Entm't Group v. Star Media Sales, Inc., 988 F.2d 476, 482-3 (3d Cir. 1993) (determining that the foreign defendants "deliberately and purposefully directed significant activities" toward the forum by directing "at least twelve communications to the forum" and by engaging in "negotiations for an agreement that would have created rights and obligations among citizens of the forum and contemplated significant ties with the forum"); Salem Steel North Am., LLC v. Shanghai Shangshang Stainless Steel Pipe Co., 2009 U.S. Dist. LEXIS 49228, at *11 (D.N.J. June 10, 2009) (finding jurisdiction proper where the foreign company sold inputs "to New Jersey-based Salem . . . [and corresponded via] e-mail and fax communications to their corporate offices in New Jersey, and by sending its president and international sales manager to New Jersey to discuss pipe quality issues."). In these cases, the Courts found electronic and in-person communications between the parties to be significant in demonstrating that a foreign entity directed its activities at the forum state.[4]

---

[4] See also Shanks v. Westland Equip. & Parts Co., 668 F.2d 1165, 1167 (10th Cir. 1982) (finding personal jurisdiction over entity having almost no direct contacts with the forum state in part because it worked in concert with another corporation that was owned by the same family that had considerable contacts with the state); Cardica, Inc. v. Integrated Vascular Interventional Techs., L.C., 2008 U.S. Dist. LEXIS 72325, at *11 (N.D. Cal. Mar. 18, 2008) ("IVIT's actions in sending two representatives to California to demonstrate the technology underlying the '268 patent, in combination with the solicitation of investment in the related technology in California, as well as IVIT's entering into contracts with various consultants in California, are sufficient to confer personal jurisdiction under the Federal Circuit's 'minimum contacts' jurisprudence."); Oakley, Inc. v. Jofa AB, 287 F. Supp. 2d 1111, 1116 (C.D. Cal. 2003) (holding that plaintiff made a "a prima facie showing that personal jurisdiction exists" where the foreign parent

It appears that there were extensive communications between Aufzüge and Schindler N.J. For instance, there were consistent correspondence between the companies, and multiple meetings every year from 2004 -2008. See id. at 7-9. During this time, Schindler N.J. began investigating the feasibility of alternate suspension systems for the North American market. Id. at 7. Accordingly, the meetings between the companies included several workshops and "viewed testings of Gates Tension Members at Schindler [NJ] facilities." Id. at 3.

Second, as to Aufzüge's provision of product specifications to Schindler N.J., the Court finds that this factor only minimally weighs in favor of finding that it purposefully directed its activities at New Jersey. The specifications were available via an internal company database, which was physically located in Switzerland. The fact that an individual in New Jersey access documents on an Aufzüge database does not alone demonstrate that Aufzüge purposefully directed its activities to New Jersey. See Trintec Indus. v. Pedre Promotional Prods., 395 F.3d 1275, 1281 (Fed. Cir. 2005). Nonetheless, the existence of the database can be relevant in a personal jurisdiction analysis insofar as it further illustrates the degree of coordination between Aufzüge and Schindler N.J.

Third, this Court finds Aufzüge's assistance and guidance to Schindler N.J. to be significant in determining whether the company has engaged in significant activities in New Jersey. In Elecs. For Imaging, the Federal Circuit found that where "two representatives of defendants visited EFI's facility in California for the purpose of demonstrating the technology underlying what later issued as the '746 patent," the defendants were properly subjected to personal jurisdiction. See 340 F.3d at 1351. Similarly, in Energy Transp. Group, Inc. v. William Demant Holding A/S, the Court observed

---

company, although contending it was merely a holding company, actually "acted in consort with [domestic] Defendants to place the accused visor in the stream of commerce, . . .[and] knew that the accused visor was being sold in California.").

that where a foreign parent company "and its subsidiaries collaborate in many areas and to a wide extent also share resources and technologies" the foreign company is subject to jurisdiction in the federal district court. 2008 U.S. Dist. LEXIS 845, at *8 (D. Del. Jan. 4, 2008). There, the Court explained that despite the fact that the companies maintained separate books and production facilities, the foreign company "acted in consort with its subsidiaries to develop the allegedly infringing hearing aid products."[5]

Here, Aufzüge sent a number of employees to Schindler N.J. during the period in which the Gates Tension Member was being developed. See Otis Br., at 14. In recent years, as many as twelve employees have been sent from Aufzüge to Schindler N.J. See id. at 13. These employees have held positions such as director of research and development (a multi-year position), as well as various engineering positions within the R&D department. See id. at 13-14. Several engineers were transferred to New Jersey for extended periods of time, in some cases exceeding a year. See id. When transferred to Schindler N.J., Aufzüge personnel are considered to be on extended business trips, and are paid by Aufzüge. Id. at 13. This Court finds this to be a strong indication of the degree of

---

[5] The Energy Transp. Group Court explained that the parent company, was

> a holding company that does not manufacture, sell, advertise, offer to sell, trade, or import any goods or services in the United States or anywhere in the world. It maintains its own financial statements and corporate records separate from the financial statements and corporate records of its subsidiaries. [The parent company] is not registered to do business in Delaware and has never contracted to supply goods or services in Delaware. It has not appointed an agent to accept service on its behalf in Delaware or anywhere in the United States. It does not maintain any offices or other facilities in Delaware or the United States. It neither owns nor leases any real property in Delaware or the United States. It does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States.

2008 U.S. Dist. LEXIS 845, at *2-3. Nonetheless, the Court found that the parent company was properly subject to jurisdiction in Delaware, because it "acted in consort with its subsidiaries to place the accused products in the stream of commerce." Id. at 13. Here, it appears that Aufzüge acted in consort with its New Jersey affiliate in product development.

coordination between the two companies.

The role that these employees had specifically with respect to development of the accused product, i..e, the Gate Tension Member, is not entirely clear on this record. One employee, Daniel Fischer, however, was involved in "the development of [an] elevator system employing the Gates Tension Member."[6] In any case, it is clear that several Aufzüge employees were involved in developing elevator belts for the U.S. market. See id. at 12. All of these employees remained on Aufzüge's payroll while working at Schindler N.J.

Moreover, technical specifications for Aufzüge products—such as the Gates Tension Member—were available through a internal company database which could be accessed by both Schindler N.J. and Aufzüge employees. Admittedly, the mere existence of a foreign database does not demonstrate "purposefully" directing activity to New Jersey, but the shared company database further illustrates the degree of coordination between the companies. As Schindler N.J. employee Dean Chow indicated, there are substantial lines of communication through which Aufzüge provides guidance to its New Jersey affiliate. Id. at 16.

Considering the various contacts between Schindler N.J. and Aufzüge, the Court finds that

---

[6] Schindler listed Mr. Fischer in response to the following interrogatory: "Describe in detail the development of the Gates Tension Member and the development of any elevator system employing the Gates Tension Member, including in your answer an identification of all persons and entities involved in the development process and a description of their role." In post-briefing letters to this Court, the parties dispute the relevance of Schindler's interrogatory answer. See docket entry nos. 77, 83. Otis contends that the interrogatory response indicates that Mr. Fischer was involved in developing belts/tension members, such as the infringing Gates Tension Member. Schindler, in contrast, responds that Mr. Fischer only worked on machines that utilized such belts. Whichever parties' reading is adopted, it appears that Mr. Fischer's work was, at the very least, "related to" the development of tension members—the way that the belts interact with the machines that utilize them would seem to this Court to be necessarily relevant to the belt development process.

Aufzüge purposefully directed its activities toward New Jersey.

  2. *Does the claim arise out of or relate to the defendant's activities with the forum?*

As discussed above, Aufzüge's activities within New Jersey were "related to" the underlying conduct that gives rise to Otis' patent infringement claim. While many of the communications and employee transfers may have been unrelated to the development of the Gates Tension Member, this Court is satisfied that the extensive contact between Aufzüge and Schindler N.J. was, at least in part, "related to" the development of elevator belts.

  3. *Is assertion of personal jurisdiction reasonable and fair under these circumstances?*

Having determine that the first two prongs of the test are satisfied, this Court must consider "whether the assertion of personal jurisdiction would comport with fair play and substantial justice." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73 (1985) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)).

Under this factor, to demonstrate that jurisdiction is improper, a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id. at 477. This factor is applied sparingly; as the Federal Circuit has explained, the "third Burger King factor . . . [only defeats] otherwise constitutional personal jurisdiction [in] the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." Campbell, 542 F.3d at 885. This assessment requires a weighing of the following five factors: "(1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering

fundamental substantive social policies." Elecs. for Imaging, Inc. v. Coyle, 340 F.3d at 1351-52. Under this prong, the burden is on the defendant to make a compelling case that jurisdiction in not reasonable. Campbell, 542 F.3d at 885.

First, there is little burden on Aufzüge to travel to the United States. Aufzüge has consistently sent representatives to New Jersey for short trips as well as extended employment placements. This fact weighs against finding a burden on Aufzüge. See Synthes v. GMReis, 563 F.3d 1285, 1299 (noting that defending a law suit in the United States was not unduly burdensome, as company representatives traveled to the United States to promote the company's product line over the last five years).

Aufzüge also asserts that if it is "forced to remain in this case, it may be subject to unnecessary and intrusive 'fishing expedition' type of discovery." Aufzüge Br., at 16. Any of Aufzüge's concerns regarding the scope of discovery, however, can be properly addressed through this Court's oversight of discovery. See, e.g., Professional Recovery Services, Inc. v. General Electric Capital Corp., 2009 U.S. Dist. LEXIS 3889, at *12-13 (D.N.J. Jan. 15, 2009).

Also as to the first factor, Aufzüge asserts that it is burdened because it would face a threat of "criminal prosecution under Swiss law if forced to provide discovery." Aufzüge Br., at 16. Although Aufzüge does not point to the specific Swiss criminal laws under which it could face prosecution, presumably it is referring to Articles 271 and 273 of the penal code, as these are the provisions it previously invoked in response to Otis' effort to depose a Swiss corporate defendant. See Schindler Elevator Corp. v. Otis Elevator Co., 657 F. Supp. 2d 525, 531 (D.N.J. 2009). There, Aufzüge argued that the two laws presented an obstacle to it being deposed. Id. at 531-33. Magistrate Judge Falk, however, determined that although "there are Swiss penal statutes that, at first blush,

appear to pose an obstacle to a non-Convention deposition . . . upon close examination, the Court is not persuaded that the Swiss laws prevent the deposition sought in this case, or that they apply at all." Id. at 531.[7] Accordingly, this Court does not find that litigation of this case would unduly burden Aufzüge.

Second, Aufzüge has not demonstrated that New Jersey's interest in this case is insignificant. Aufzüge states that it has little presence in New Jersey, and that its activities have little or no impact on the State's residents. This Court disagrees. New Jersey, like all states, has an interest in enforcing intellectual property laws. See Synthes, 563 F.3d at 1299 ("The United States has a substantial interest in enforcing the federal patent laws") (internal citations omitted); Rudolph v. Yari Film Group Releasing, 2007 U.S. Dist. LEXIS 21646, at *14 (D.N.J. Mar. 27, 2007) ("[T]he State of New Jersey has a strong interest in protecting Rudolph's (a New Jersey citizen) copyright from infringement"); Energy Transportation Group, 2008 U.S. Dist. LEXIS 845, at *15 ("Delaware has an interest in discouraging injuries that occur within the state, which extends to patent infringement actions such as the one here."). Further, "New Jersey has an interest in protecting its residents and corporations [such as Otis] from the injuries inflicted by out-of-state and foreign actors, and in preventing breaches of contract from affecting its economy and commercial operations." Metex Mfg. Corp. v. Ian Manson, 2006 U.S. Dist. LEXIS 54891, at *16 (D.N.J. Aug. 4, 2006); see Synergy, Inc. v. Manama Textile Mills, W.L.L., 2008 U.S. Dist. LEXIS 12791, at *47 (D.N.J. 2008).

Third, Otis has a strong interest in maintaining Aufzüge in the current litigation. As a key player in research and development of the allegedly infringing product, Aufzüge presence may be

---

[7] To the extent that Aufzüge believes that these laws, or any others, would present some other barrier to discovery, it has not presented them to this Court.

critical to discovery. Otis asserts that the infringing product is a copy of an Otis product, the "Coated Steel Belt." As Aufzüge plays a key role in product development, its actions are important to this litigation. For example, in the underlying patent validity litigation, Schindler contends that Otis' patent is invalid as "obvious." Otis intends to respond that its product is not obvious, and will likely demonstrate that Aufzüge actions are relevant to the obviousness determinate (e.g., that Aufzüge copied Otis' design).[8] Accordingly, Otis has an interest in maintaining Aufzüge in the current litigation.

Finally, under the fourth and fifth factors, the Court must consider the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. To the extent that these fators are applicable, they weigh in favor of maintaining this action for the same reasons discussed above with respect to the third factor.

\* \* \* \* \*

This Court finds that "accept[ing] all of the plaintiff's allegations as true and constru[ing] disputed facts in favor of the plaintiff," Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004), Otis has demonstrated that: (1) Aufzüge purposefully directed its activities at New Jersey, (2) such activities are related the claim asserted by Otis, and (3) assertion of personal jurisdiction is reasonable and fair. See Synthes v. GMReis, 563 F.3d 1285, 1297 (Fed. Cir. 2009). Accordingly, specific jurisdiction may be asserted here.

---

[8] See, e.g., Vandenberg v. Dairy Equipment Co., 740 F.2d 1560, 1567 (Fed. Cir. 1984) ("[C]opying of an invention may constitute evidence that the invention is not an obvious one.")

-15-

### III. SCHINDLER AUFZÜGE'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6)

Otis asserts a counterclaim against Aufzüge for actively inducing direct infringement of its patent by Schindler N.J. Pursuant to 35 U.S.C. § 271(b), "whoever actively induces infringement of a patent shall be liable as an infringer." Aufzüge moves to dismiss the counterclaim for failure to state a claim. Aufzüge asserts that (1) Otis has not adequately plead its claim for induced infringement, and (2) Otis cannot be liable for any indirect infringement that may have occurred prior to May 26, 2009, because it did not receive notice until such time.

#### A. APPLICABLE LAW

In deciding a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. See Warth v. Seldin, 422 U.S. 490, 501 (1975); Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir.1998). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court shall dismiss a complaint for failure to state a claim. Hishon v. King & Spalding, 467 U.S. 69, 73 ( 1984). In Bell Atlantic Corp. v. Twombly the Supreme Court clarified the Rule 12(b)(6) standard. ___ U.S. ___, 127 S.Ct. 1955 (2007). Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." Twombly, at 1968 (citing Conley, 355 U.S. at 45-46). Instead, the Supreme Court instructed that "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id.

at 1965. Ultimately, the question is whether the claimant can prove a set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).

### B. ANALYSIS

#### 1. *Failure to State a Claim*

Aufzüge first asserts that Otis failed to adequately plead its claim of inducement to infringe the '433 Patent.

Otis, in its First Amended Complaint, alleged that Aufzüge has "manufactured, offered for sale, sold, and/or used certain elevator belt products, including the Gates LL MV 90-07 Tension Member" in Europe, "assisted, directed, and managed" "Schindler NJ's research and development related to the Gates Tension Member," and "actively induced Schindler NJ to use the infringing Gates Tension Member" in the United States." Otis Br. at 26. Otis, then, alleges that Aufzüge was aware of the '433 Patent, and that it has intentionally contributed to Schindler N.J.'s direct infringement thereof. These allegations are sufficient to state a claim at this stage of the proceedings. See, e.g., Grice Eng'G v. Jg Innovations, 2010 U.S. Dist. LEXIS 20314, at *29 (March 4, 2010) (finding that a claim for inducing infringement to be adequately plead where plaintiff asserted that defendant was "aware of plaintiff's patent rights . . . and acted willfully to infringe plaintiff's patent"); Takeda Chemical Industries, Ltd. v. Watson Pharmaceuticals, Inc., 329 F. Supp. 2d 394, 401 (S.D.N.Y. 2004) (allegations that "Watson has taken and will take acts to induce infringement" of specified patents is "sufficient to state a claim"); Wyeth v. Lupin, Ltd., 505 F. Supp. 2d 303, 308 (D. Md. 2007) (allegations of aiding and abetting infringement sufficient to "satisf[y] the notice pleading requirements"). Accordingly, Aufzüge's motion to dismiss under FED. R. CIV. P. 12(b)(6), must be

denied.

### 2. *Liability and Notice of Patent Rights*

Aufzüge also asserts that Otis has failed to state a claim for induced infringement because "a party cannot be liable for inducement of infringement when actual notice of the alleged infringement has not yet been given."

Pursuant to 35 U.S.C. § 271(b), "whoever actively induces infringement of a patent shall be liable as an infringer." Inducement requires a showing of "'specific intent to encourage another's infringement.'" Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 699 (Fed. Cir. 2008) (quoting DSU Med. Corp. v. JMS Co., 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc)). Under that rule, a plaintiff must show that the alleged infringer knew or should have known that his actions would induce actual infringements. See DSU Med. Corp., 471 F.3d at 1304 ("The requirement that the alleged infringer knew or should have known his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent.").

Aufzüge states that it did not receive notice of the '433 Patent until after it committed the conduct that forms the basis of Otis' alleged infringement claim. Thus, Aufzüge reasons, it cannot be liable for such conduct, and accordingly, Otis' claim for induced infringement must fail. The Court does not agree.

Otis' failure to provide notice is not fatal to its induced infringement claim. As the Federal Circuit has explained, "[t]he failure to mark a product under § 287(a) or to provide the requisite **notice** does not prohibit a patentee from bringing an infringement suit to obtain an injunction or damages occurring after the complaint was served. Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d

1329, 1340 (Fed. Cir. 2008). Here, Otis seeks injunctive relief with respect to a course of conduct between Aufzüge and Schindler N.J. At this stage, taking the facts as alleged by Otis, there appear to be sufficient allegations to suggest that Schindler N.J. and Aufzüge's coordination was substantial. There is no indication that such cooperation ceased after the date of the official notice of Otis' patent, May 26, 2009 (i.e., the date of service). Accordingly, Otis may still proceed on it induced infringement claim, as it seeks injunctive relief against Aufzüge with respect to its continued involvement (e.g., product development) in Schindler N.J. activities.

## IV. CONCLUSION

For the reasons stated, Aufzüge's motions to dismiss Otis' counterclaims pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6) are denied.

S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:        March   16  , 2010
Original:    Clerk's Office
cc:          All Counsel of Record
             The Honorable Mark Falk, U.S.M.J.
             File